UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NORMAN JOHNSON,

                Plaintiff,

-against-

REBECCA MACDONALD, *et al.*,

                Defendants.
------------------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CV-3699 (SLT) (LB)

**TOWNES, United States District Judge:**

Plaintiff Norman Johnson – a 47-year-old black man and a native of the nation of Jamaica

– brings this employment discrimination action against defendant Just Energy ("Defendant" or

"Just Energy"), a Canadian-based energy supply company (or "ESCO") for which plaintiff once

worked. Defendant now moves for summary judgment, arguing that plaintiff cannot make out a

*prima facie* case of discrimination; that Defendant has presented a legitimate, non-discriminatory

reason for terminating plaintiff and that plaintiff cannot demonstrate that Defendant's reasons are

a pretext for discrimination. For the reasons set forth below, Defendant's motion is granted.

### BACKGROUND

#### *Just Energy's Business*

Plaintiff's pleadings and submissions assume a familiarity with the nature of Just

Energy's business and the manner in which it operates, but do not provide the necessary

background. Accordingly, the facts in this section are drawn largely from Defendant's Statement

of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Def. 56.1"), which are not

controverted in Plaintiff's Counterstatement to Defendant's Statement of Undisputed Material

Facts Pursuant to Local Rule 56.1 ("Pl. 56.1") or in Plaintiff's Supplemental Counterstatement to

Defendant's Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl. Supp.

56.1"). *See* Local Rule 56.1(c) of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York (uncontroverted allegations in a statement of material facts pursuant to Local Rule 56.1 are deemed admitted).

Defendant is an independent energy supplier, providing natural gas and electricity to both residential and commercial customers (Def. 56.1 at ¶4; Pl. Supp. 56.1 at ¶2). Defendant sells its products and services door-to-door through sales representatives, which it calls "Independent Contractors" or "ICs" (Def. 56.1 at ¶6; Affidavit of Richard Teixiera, dated Dec. 3, 2011 ["Teixiera Aff."] at ¶3). Although plaintiff's submissions sometimes refer to plaintiff and his fellow sales representatives as "ICs," plaintiff does not concede that they are actually independent contractors rather than employees. *See* Fourth Amended Complaint at 4 (raising the question of "Whether or not plaintiff was an employee within the meaning of the law?").

Defendant's business is regulated by the State of New York (Def. 56.1 at ¶11). As explained in a December 13, 2010, decision issued by Administrative Law Judge Henry A. Sullivan of the Unemployment Insurance Appeals Board (attached as Ex. 31 to the Declaration of Rebecca Tingey in Support of Defendant's Motion for Summary Judgment [the "Tingey Declaration"]):

> [T]he Uniform Business Practices regulations ("UBP") of the New York Public Service Commission ("PSC") . . . set[s] forth required business procedures for both ESCO's [*sic*] and their marketing representatives. More specifically, the regulations require ESCO's [*sic*] to ensure that their training of marketing representatives includes knowledge of: the UBP; the ESCO's products, services, rate[s] and fees; the customers' right to cancel; the Home Energy Fair Practices Act that pertain[s] to residential customers; and the ability to provide the customer with a toll-free telephone number from which the customer may obtain information about the ECSO's mechanisms for handling billing questions, disputes and

> complaints. The UBP also prescribe various provisions that
> ESCO's [*sic*] must include in their sales agreements with
> customers.

*Id.* at 3 (bracketed material added). Defendant contends – and plaintiff does not deny – that Defendant is subject to disciplinary procedures, fines, and litigation if the marketing activity of one of its sales representatives does not comply with the applicable laws and regulations (Def. 56.1 at ¶12; Teixeira Aff. at ¶7).

Defendant operates through "regional offices," each of which is headed by a regional distributor or manager (Def. 56.1 at ¶7; Teixeira Aff. at ¶4; *see* Fourth Amended Complaint at ¶2). According to Defendant's Director of Sales, the regional distributor is responsible for the marketing behavior of the sales representatives assigned to his or her office (Def. 56.1 at ¶8; Teixeira Aff. at ¶4). Accordingly, each sales representative is supposed to market from one regional office at a time and is assigned a "badge number that is directly correlated to the regional office and regional distributor" (Def. 56.1 at ¶9). A sales representative can switch offices, provided that the transfer is approved by the "corporate office" (Def. 56.1 at ¶10; Teixeira Aff. at ¶5).

Defendant's sales representatives are paid a commission for each contract they procure on Defendant's behalf (Complaint at 2). However, Defendant also offers overseas trips as a further sales incentive (Teixeira at ¶8). To qualify for one of these trips, a sales representative must, through his or her sales, earn a certain number of "points" during a specific period (*id.*).

### Plaintiff's History at Just Energy

Except where otherwise indicated, the following facts are either undisputed, based on documentary evidence, or drawn from plaintiff's submissions or his June 16, 2011, deposition.

3

Although all of plaintiff's submissions are unsworn, this Court assumes, for purposes of this Memorandum and Order, that the *pro se* plaintiff would be prepared to swear to the truth of the allegations contained therein.

On or about November 13, 2006, plaintiff started working for Defendant – then known as either US Energy Savings Corp. or Energy Savings Marketing Corp. – as a sales representative in its office in Kew Gardens, Queens (Def. 56.1 at ¶¶14, 19; Pl. Supp. 56.1 at ¶2; Complaint at 2). At all times relevant to this action, a man named Chad Langford was the regional distributor or manager of the Kew Gardens Office. According to plaintiff, Langford was "difficult to work with" and "demanding" – not just with plaintiff, but with everyone in the office (Plaintiff's Deposition dated June 16, 2011 ["Pl. EBT"], at 125).[1] Langford demanded that the sales representatives work seven days a week and generate 50 or more "deals" a week (*id.*), and threatened that those who failed to do so would not "have a job" (Complaint at 2).

Plaintiff's career in the Kew Gardens Office began inauspiciously. According to an "IC Summary" (attached as Exhibit 8 to the Tingey Declaration), four customers complained about plaintiff before the middle of December 2006. Two of the customers alleged that plaintiff had made misrepresentations about Just Energy's programs and/or identity and two disputed the validity of the signature that plaintiff allegedly obtained on a contract (*id.*). However, one of the latter complaints – alleging that plaintiff had forged the customer's signature – was dismissed after the customer failed to provide further information regarding the claim (*id.*).

---

[1]Portions of the transcript of this deposition are attached to the Tingey Declaration as Exhibit 1.

In January 2007, plaintiff was suspended for two weeks following an incident in which he pushed a potential customer's son in a dispute over whether the customer could retain a copy of an unexecuted contract. Plaintiff does not deny that this incident occurred, but claims that the suspension was "illegal" because the confrontation resulted from plaintiff's attempts to comply with Langford's own directives (Pl. Supp. 56.1 at ¶11). According to plaintiff:

> Langford told plaintiff not to leave contracts unless it was successfully completed[. P]laintiff was lead [*sic*] to believe that it was company policy. Had it not been for his ill advice[,] plaintiff would not have had this confrontation with the son of a potential customer (*id.*).

According to plaintiff's Affirmation ("Pl. Aff."), attached to Plaintiff's Cross Motion in Opposition to Defendant's Motion, Langford never spoke to plaintiff about any customer complaints, other than the one that resulted in plaintiff's suspension (Pl. Aff. at 1). In contrast, Duane Matthews, who worked as the Office Crew Coordinator under Langford, twice threatened to fire plaintiff because of his lack of production. According to Matthews' affidavit – which was submitted to the Court by plaintiff – Matthews twice called plaintiff into his office "and told him that if he wanted to keep his job he would need to improve his production because Chad Langford wanted to fire him" (Affidavit of Duane Matthews, dated Mar. 19, 2012 ["Matthews Aff."], at 2).

Thereafter, there was an "impressive improvement" in plaintiff's production (*id.*). Plaintiff qualified for two sales incentive trips in 2007: one to Brazil and one to Las Vegas. Plaintiff went to Brazil, but not to Las Vegas, ostensibly because Langford misled him to believe that he could receive cash in lieu of the trip. According to plaintiff, Langford told sales representatives who qualified for the Las Vegas trip but who did not want to go, "you should fill

5

this application out and you will be paid" (Plaintiff's Cross Motion in Opposition to Defendant's Motion for Summary Judgment ["Plaintiff's Cross Motion"] at 2). Plaintiff and another Jamaican sales representative, Douglas Pryce, decided that they could go to Las Vegas on their own at another time and submitted the application (*id.*). Thereafter, Langford held a second contest for their trips (*id.*). However, Langford never compensated plaintiff and Pryce for the tickets, allegedly telling them that "there was no money as the company did not sell the itinerar[ies]" (Third Amended Complaint at 3).

The number of customer complaints relating to plaintiff also declined during the course of 2007. According to the IC Summary, plaintiff had no customers complaints in February, March or April 2007, and only three complaints over the remainder of the year (Tingey Declaration, Ex. 8). Langford publicly praised plaintiff, telling sales representatives at a morning meeting that, if they wanted "to learn how to write business," they should accompany "big Norm, the man with the million dollar smile" (Matthews Aff. at 2).

Following this increase in plaintiff's production and the decrease in customer complaints, Matthews called plaintiff and "told him that based on his production where there was no complaint [Matthews] would be promoting him" to assistant crew coordinator (*id.*, *see* Pl. EBT at 107; Def. 56.1 at ¶21). As part of his new duties, plaintiff trained new sales representatives (Pl. Aff. at 2; Def. 56.1 at ¶21). Among the people plaintiff trained was a Jamaican woman named Ingrid Cotterell Ingram ("Ingram") (Pl. EBT at 48; Def. 56.1 at ¶22). Plaintiff and Ingram became friends and worked together throughout their tenure at Just Energy (*id.*, Deposition of Ingrid Cotterell Ingram ["Ingram EBT"] at 76).[2]

_____

[2]The Ingram EBT is attached to the Tingey Declaration as Ex. 18.

In March 2008, plaintiff and Ingram left the Kew Gardens office and went to work in Defendant's Bronx office (Pl. Supp. 56.1 at ¶4; Def. 56.1 at 24). According to plaintiff, their departure occurred after plaintiff was stripped of his position as Assistant Crew Coordinator (Pl. EBT at 108). Plaintiff does not profess to know the reason for his demotion but noted at his deposition that his demotion occurred after Duane Matthews was removed from his position and replaced with one Jeff Logan:

> I lose [*sic*] the position before I leave the office because Duane was the office crew coordinator. I was under Duane. He [Langford] strip [*sic*] me for whatever reason he strip [sic] me and say I should start over again with Jeff Logan (Pl. EBT at 108).

There is no suggestion in the record that Matthews' demotion was related to race, nationality, or any improper factor. Indeed, in Matthews' affidavit – submitted by plaintiff after Defendant's motion was fully briefed – Matthews states that he was demoted after he was arrested on domestic violence allegations and missed three or four days of work (Matthews Aff. at 1). Moreover, there is nothing to suggest that Langford intended to drive plaintiff or Ingram from the office. To the contrary, Ingram testified at her deposition that Langford was "upset" that she and plaintiff left (Ingram EBT at 91).

In or about April 2008, the Bronx office was closed (Pl. Supp. 56.1 at ¶4). According to plaintiff, Just Energy's CEO gave the Bronx sales representatives the option of going to the Kew Gardens or Brooklyn offices (Pl. EBT at 108). Plaintiff and Ingram elected to go the Brooklyn Office, where they worked under a regional distributor named Cyrus (*id.*).

Both plaintiff and Ingram were working in the Brooklyn Office when Langford asked them to return to the Kew Gardens Office (Pl. Supp. 56.1 at ¶5; Pl. EBT at 109; Def. 56.1 at

¶26). Plaintiff implies that Langford forced them to meet with him by arranging to have their paychecks sent to the Kew Gardens office (Pl. EBT at 108-09; Pl. Supp. 56.1 at ¶5). When plaintiff and Ingram went to Kew Gardens to retrieve their checks, Langford told them he needed their help to win the "Office of the Year" award (*id.*). Plaintiff asserts that Langford offered them incentives to return, telling them that they would not have to attend morning meetings and telling plaintiff that he would receive "his own override" (Pl. Supp. 56.1 at ¶6).

Plaintiff and Ingram eventually agreed to return to Kew Gardens. At his deposition, plaintiff explained his rationale for doing so:

> [T]he reason why we decide[d] to go back to him [Langford] is because the regional [distributor] in the Brooklyn office seems not to be any different then than Chad so I told Ingrid that because we start with Chad, it be better we go back and take this kind of crap from Chad rather than take it from Cyrus, and we both decide[d] to go back (Pl. EBT at 109-10) (bracketed material added).

According to plaintiff, Langford "got happy" when plaintiff and Ingram agreed to return (Pl. Supp. 56.1 at ¶8).

Plaintiff and Ingram returned to work in Kew Gardens in mid-2008 (Pl. Supp. 56.1 at ¶7).[3] According to plaintiff, they both "wrote a lot of business" and were integral in enabling Langford to win the "Office of the Year" award (Pl. EBT at 110). In addition, the IC Summary indicates that between July 1, 2008 and April 2009 – when plaintiff again left the Kew Gardens Office – only a single customer complained about plaintiff (Tingey Declaration, Ex. 8).

---

[3]At his deposition, plaintiff expressed uncertainty regarding whether they returned in 2008 or 2009 (Pl. EBT at 109). However, other facts in the record – such as the date on which plaintiff registered for the trip to Australia (*see* p. 9, *post*) – indicate that they returned in 2008.

8

Moreover, Defendant's investigation into that complaint was closed as inconclusive after that customer failed to respond to requests for more information (*id.*).

Several incidents occurred in 2009, however, that impacted plaintiff's relationship with Langford. First, in January 2009, Langford fired Ingram (Pl. EBT at 144). According to plaintiff, Langford told Ingram to "go out in the field" with another representative named Spencer Shield (Plaintiff's Cross Motion at 5). Instead, Ingram worked with another representative, Khani Sanders, and "wrote no deals" (*id.*). The next day, Langford called Ingram and asked, among other things, why she had not worked with Shield (*id.*). Ingram claimed that Shield was smoking marijuana, but Sanders refused to "be a snitch" and to corroborate Ingram's claim (*id.* at 5-6). Langford suspended Sanders and terminated Ingram (*id.* at 6).

Langford advised plaintiff of this development by placing a "yellow sticky note" on plaintiff's check which read, "I got rid of Ingrid for you" (*id.* at 5). Plaintiff showed the note to Ingram, who interpreted it to mean that plaintiff had asked Langford to terminate her (*id*). Plaintiff implies that this created tension between him and Ingram, stating that "she asked plaintiff in an angry way what . . . Chad meant . . ." (*id.*).

The second incident related to a sales incentive trip to Australia, which plaintiff and Ingram won in late 2008 or early 2009 (Pl. EBT at 26; Def. 56.1 at ¶60). Plaintiff electronically registered for the trip on January 14, 2009, on a website created for that purpose by Pareto, a marketing company in Toronto, Ontario, that organizes Defendant's sales incentive trips (Pl. EBT at 26; Tingey Declaration, Ex. 14). According to Megan Taylor, a Senior Program Manager in the Events Division of Pareto, the website advised registrants of the paperwork necessary to enter Australia as follows:

9

> Entry Requirements Australia:
>
> Canadian and American citizens require a valid passport and visa to enter Australia. Passports must be valid six (6) months beyond the return date of travel. Please scan your passport and email to mtaylor@pareto.ca to obtain a visa. Your passport must be sent no later than January 31st to ensure enough time to process your visa.
>
> If you do not hold a Canadian or American passport please contact the Fiji and Australian Consulate near you to find out what you require for travel.

(Affidavit of Megan Taylor, dated Dec. 15, 2011 ["Taylor Aff."], at ¶7). However, because plaintiff paid "Liz," who worked at the front desk of the Kew Gardens office, to complete the online registration for him and "didn't go on the website [him]self," he never saw the entry requirements (Pl. EBT at 41).

Plaintiff – who had qualified for, and attended, a sales incentive trip to Brazil in 2007 (Pl. EBT at 18-19) – was nonetheless aware that he, as the holder of a Jamaican passport, would need to go to the consulate and obtain his own visa (Pl. EBT at 43-44). However, he believed that he needed to present his itinerary in order to obtain the visa (*id.* at 44). That belief was based on his experiences prior to the Brazilian trip, when the person who gave plaintiff his itinerary informed him that he had to present both his itinerary and passport to obtain a visa (*id.* at 39). Plaintiff had not contacted the Australian consulate concerning the visa requirements (*id.* at 45), but assumed that an itinerary was necessary to obtain a visa regardless of the country involved.

Plaintiff did not ask Langford or anyone else at the Kew Gardens office for his itinerary (*id.* at 39). Rather, on February 25, 2009, Langford telephoned plaintiff to say that he had plaintiff's itinerary (Fourth Amended Complaint at ¶4). Plaintiff and Ingram finally received their itineraries on February 27, 2009 – approximately one week before the trip was scheduled to

10

begin (*id.* at 44, 47; Plaintiff's Cross Motion at 3-4). At his deposition, plaintiff testified that, while handing them their itineraries, Liz said, "I don't know why Chad did this," and told them that "everyone already obtained their itinerary and had already gone to the embassy and had already gotten their visa" (Pl. EBT at 32). Plaintiff further testified that Liz told plaintiff and Ingram, "I don't think you guys are going to make it because in order to get a visa you have to be there at the consulate 15 days before the time to travel" (*id.* at 44).

Plaintiff and Ingram did not visit the Australian consulate in Manhattan until March 3, 2009 (*id.* at 45). The consulate informed them that they did not issue visas, that the applications had to be mailed to the embassy in Washington, D.C., and that it would take 15 days to receive a visa (*id.* at 46). Accordingly, plaintiff and Ingram were unable to go on the trip (*id.* at 46-47).

The third incident occurred in April 2009, after plaintiff was attacked by a dog while working (Pl. Supp. 56.1 at ¶9). Plaintiff was hurt and could not work for the rest of the day (*id.*). However,

> [T]he following day Langford called plaintiff into his office and asked about business the previous day[. W]hen plaintiff told him what had happened with the dog he said he didn't want to hear it and that plaintiff needed to have fifty deals (*id*).

After this incident, plaintiff decided to leave the Kew Gardens Office (*id*).

Sometime in April 2009, plaintiff started working for the Wall Street Office in Manhattan, where he was reunited with Ingram (*id.*; Def. 56.1 at ¶30). Ali Mamune, the regional distributor in charge of the Wall Street Office, told plaintiff that he only had to attend morning meetings on Mondays (Plaintiff's Cross Motion at 9). Accordingly, plaintiff attended meetings only once a week (*id.*).

11

The Independent Contractor Agreement which plaintiff signed upon his transfer to the Wall Street Office (attached to the Tingey Declaration as Ex. 7) included a rider, entitled a "New York AOD Obligations Certification." This document alluded to an agreement which Defendant had entered into "in order to resolve the concerns of the New York Attorney General in connection with allegations they received about some contractors' conduct." Although the rider did not attach a copy of that agreement – called an "Assurance of Discontinuance" or "AOD" – it informed plaintiff:

> You **WILL** have your agreement with Energy Saving Marketing Corp. (ESMC) terminated if, on more than two occasions in any 12 month period, it is determined by ESMC that you: did not identify yourself fully and properly, including that you do not represent the utility; or promised savings; or failed to state the term and price of the agreement (Tingey Declaration, Ex. 7) (emphasis in original).

Plaintiff signed the rider on April 20, 2009.

Beginning in late May 2009, the number of customer complaints against plaintiff began to increase. According to the IC Summary, four customers complained about plaintiff between May 28, 2009, and October 16, 2009 – as many as had complained about plaintiff in all of 2008 (Tingey Declaration, Ex. 8). With one exception, the IC Summary does not indicate how these complaints were resolved (*id.*). Plaintiff does not deny that these complaints were made, but argues that they were meritless.

In November 2009, Mamune was replaced as regional distributor by a man named Ali Zamany (Plaintiff's Cross Motion at 5, 14; Affidavit of Ali Zamany, dated Dec. 22, 2011 ["Zamany Aff."] at ¶2). While plaintiff claims that "there were no fraudulent transactions being done" under Mamune (Plaintiff's Cross Motion at 5), plaintiff implies that Zamany condoned –

12

even encouraged – deceptive practices. For example, Zamany – like Langford – instructed sales representatives to tell customers that they were "contributing two pennies [per kilowatt] toward global warming" by buying "green energy" from Defendant (*id.* at 4). In fact, the "green energy" option – which paid greater commissions than other products – cost the customers two cents more per kilowatt (*id.*).

According to the IC Summary, two customers complained about plaintiff in the first two weeks of March 2010 (Tingey Declaration, Ex. 8). On March 16, 2010, Wayne Morgan, a Team Leader in Defendant's Corporate and Consumer Relations Department, sent Zamany an e-mail, directing Zamany to have plaintiff and Ingram come into the office to discuss their "compliance ratios" (Tingey Declaration, Ex. 10; Zamany Aff. at ¶3). On March 22, 2010, Zamany had a conference call regarding plaintiff and Ingram with Defendant's Compliance manager, Vanessa Anesetti, and Humera Siddiqui, Defendant's Regional Sales Manager for Eastern United States Sales (Tingey Declaration, Ex. 11; Zamany Aff. at ¶4).

On the morning of March 22, 2010, Anesetti sent Morgan an e-mail describing the substance of the conversation she and Siddiqui had with Zamany. According to Anesetti, Zamany claimed that plaintiff and Ingram did not show up to sales meetings and were "affecting his office demeanor and stats" (Tingey Declaration, Ex. 11). Noting that he had not trained plaintiff and Ingram, but was "responsible for any RD [regional distributor] consequence associated to their complaints," Zamany complained that it was "unfair that he . . . inherited all these issues and that his office [numbers] look worse than they really are . . . " (*id.*).

Zamany and Siddiqui wanted the Corporate and Consumer Relations Department to "complete a call with [plaintiff and Ingram] and put them on their final warning" (*id.*). Anesetti,

however, reviewed their compliance records and found that their "allegation ratios" did not warrant such an action (*id.*). Instead, she recommended having a call with plaintiff and Ingram "to discuss the importance of them showing up to their meetings, taking direction from [Zamany] and going through [Zamany's] reorientation" (*id.*).

The parties disagree as to whether such a call took place. Zamany states that he, Morgan and Siddiqui had a conference call with plaintiff and Ingram on March 29, 2010, during which he advised the two sales representatives that "due to their high allegation ratios, if they wanted to continue to market and receive office support from the Wall Street office, they would have to come by the office regularly to receive up to date information regarding Just Energy products and compliance with applicable legal and/or regulatory requirements" (Zamany Aff. at ¶5). Plaintiff denies that Morgan or Siddiqui spoke to him on March 29, 2010 (Plaintiff's Cross Motion at 10; Pl. Supp. 56.1 at ¶13). However, plaintiff recalls Zamany telling him and Ingram, "if you guys want to continue working in this office you have to start coming in five days per week" (Pl. Supp. 56.1 at ¶14). Plaintiff asserts that he and Ingram agreed to do so (*id.*), but Zamany claims that they "did not regularly come by the office . . . as requested" (Zamany Aff. at ¶6).

Nonetheless, plaintiff and Ingram continued to work from the Wall Street Office. Plaintiff asserts that in April 2010 he warned Zamany that some of the "new" sales representatives were "not writing clean business" (Plaintiff's Cross Motion at 4; Pl. Aff. at 2). According to plaintiff, he was vindicated when two of the office's biggest producers – whom Siddiqui had singled out for praise during a May 2010 office visit – were subsequently discovered to have written fraudulent business (*id.* at 5). However, according to the IC

14

Summary, plaintiff himself was the subject of several more customer complaint in May and June, 2010 (Tingey Declaration, Ex. 8).

Shortly after the sales representatives who wrote the fraudulent business were terminated, Just Energy closed the Wall Street Office (Pl. EBT at 225). According to Zamany, he announced the closure on July 8, 2010, and told the sales representatives to report to the Kew Gardens Office immediately (Zamany Aff. at ¶7). However, plaintiff did not learn of the closure until July 13, 2010, when he received a call from a co-worker named Tamara telling him that "the head office said that all remaining workers must go to Kew Gardens . . ." (Pl. EBT at 100).

Plaintiff and Ingram immediately went to the Kew Gardens Office (*id.*). Langford, however, refused to admit them (Plaintiff's Cross Motion at 3). On July 15, 2010, plaintiff called Defendant's headquarters and told someone named "Rosalba" that he and Ingram had not been accepted at Kew Gardens (*id.*). Thereafter, plaintiff received a call from Morgan (*id.*). According to plaintiff, Morgan said:

> I am not saying that you can't market for Just Energy but Humera Siddiqui is on vacation[.] [W]hen she gets back she will call and let you know how to market on your own without an office base (*id.*).

Morgan did not "state that he was from compliance" or that "there were some allegations against [plaintiff]" (*id*). Nonetheless, plaintiff claims that he asked, "[W]hat did I do wrong?" and that Morgan replied, "I am not at liberty to discuss it" (*id*).

Siddiqui never called plaintiff. Rather, on the morning of Tuesday, July 20, 2010, she sent Morgan an e-mail in which she refused to allow plaintiff and Ingram to market on their own, stating:

15

> Sales feels they would potentially pose a risk to our business
> without the leadership and guidance of a Regional and the benefits
> of visiting a Regional office on a regular basis. Please be advised
> that Sales has decided to terminate the IC agreements for [Ingram
> and plaintiff] effective immediately (Tingey Declaration, Ex. 12).

Plaintiff was advised of this decision in a letter dated July 21, 2010, from James Herod, Senior Vice President of Sales and Marketing. The letter informed plaintiff that his Independent Contractor Agreement had been terminated effective July 19, 2010, "as a result of [plaintiff's] breach thereof" (Tingey Declaration, Ex. 13). Plaintiff also received a call from Morgan on July 22, 2010, advising him of his termination.

### The Instant Action

On August 10, 2010, plaintiff, proceeding *pro se*, commenced this action against Defendant and eight individuals employed at Just Energy's Canadian headquarters, including Siddiqui, Morgan, and Herod. Plaintiff did not mention his race, age, or national origin, but alleged that this Court had jurisdiction under 28 U.S.C. §1331, that the defendants had discriminated against him and that he had contacted the Equal Employment Opportunity Commission ("EEOC") in Manhattan (Complaint at 2, 3). Plaintiff also did not attach a right-to-sue letter, but alleged that the EEOC had told him that it lacked jurisdiction (*id.* at 2).

On August 17, 2010, plaintiff amended his complaint for the sole purpose of adding two lines of text which had been omitted from the previous version. However, even as amended, the pleading did not contain any substantive allegations concerning any of the individual plaintiffs other than Siddiqui, Morgan, and Heron. In addition, while the Amended Complaint alleged that jurisdiction was predicated on 28 U.S.C. § 1331, it still did not allege which federal statute or

16

provision of the United States Constitution was allegedly violated by these, or any other, defendants' actions.

In a Memorandum and Order dated August 27, 2010, this Court noted these deficiencies in the Amended Complaint. The Court stated that while plaintiff appeared to be alleging some sort of employment discrimination, it was unclear whether he was alleging discrimination on the basis of race, color, gender, religion or national origin in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5(e); age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; or some other form of discrimination. The Court also explained that individuals may not be held liable under Title VII, and noted that the Amended Complaint did not allege whether plaintiff had filed a charge of discrimination with the EEOC or received a right-to-sue letter. The Court then granted plaintiff leave to re-plead to cure these deficiencies.

On September 14, 2010, plaintiff filed a document entitled, "Plaintiff['s] Motion to Amend Initial Pleading" ("Plaintiff's Motion"), which specifically referred to Title VII and to the New York State Human Rights Law and implied that plaintiff was seeking to allege discrimination based on race, color, and/or national origin. However, Plaintiff's Motion named nine individual defendants, in addition to plaintiff's former employer; did not allege what, if any, actions each of these nine individuals took; and made no mention of an EEOC charge or right-to-sue letter. Moreover, Plaintiff's Motion did not allege facts suggesting employment discrimination, but suggested two other reasons for his termination. First, Plaintiff's Motion stated that "part of the decision to terminate him stem[med] from his decision not to help

17

[Zamany] train new agents" (Plaintiff's Motion at 2). Second, Plaintiff's Motion implied that plaintiff was not meeting a sales quota, stating:

> [A]ll agents were required to submit the minimum production of twenty five R.C.E. per week. . . . Plaintiff was not reaching that and believe [*sic*] it formed a part of the decision as well (*id*).

On October 18, 2010, this Court received a document entitled "2nd Amended Complaint." This pleading was essentially a combination of Plaintiff's Motion and plaintiff's Amended Complaint. The 2nd Amended Complaint added Chad Langford as a defendant, but omitted any specific mention of race, color, or national origin discrimination. Although the 2nd Amended Complaint alleged that "Defendant[s] . . . violated the civil rights act of 1964 [and] New York State Human Rights Law," it alleged only that "defendants have discriminated against the plaintiff" and that "defendants' unlawful action[s] affected the plaintiff mentally and emotionally." 2nd Amended Complaint at 4. Noting that this pleading served only to confuse, rather than to clarify, plaintiff's theories of liability, the Court granted plaintiff leave to file yet another amended complaint.

On November 8, 2010, plaintiff filed a Third Amended Complaint, which clarified that plaintiff was alleging discrimination based on "race, color, gender, religion or national [origin]," in violation of Title VII; discrimination based on age in violation of the ADEA; and violations of the New York Human Rights Law (Third Amended Complaint at 1). Although the caption did not list all of the defendants – referring to the defendants as "Rebecca Macdonald et al [*sic*]" – the body of the pleading requested that any "individual defendants" over which the Court lacked jurisdiction be "excused" (*id*. at 2). The pleading did not attach a copy of a right-to-sue letter, but alleged that plaintiff had contacted both the EEOC and the Department of Labor and had been

informed that neither agency had jurisdiction because plaintiff was an independent contractor (*id.*).

The Third Amended Complaint alleged three instances of discrimination: the 2007 incident in which Langford failed to compensate plaintiff and Pryce, both of whom were Jamaican, for the Las Vegas trip; the 2009 incident in which plaintiff did not receive his itinerary in time to make the Australian trip; and plaintiff's termination in July 2010. With respect to the latter, the pleading principally alleged that plaintiff and Ingram, who are both Jamaican, were the only sales representatives from the Wall Street Office who were not admitted to the Kew Gardens Office, and that those workers who were admitted were all younger than plaintiff. In addition, the pleading alleged that other workers were allowed to continue working "in the absence of an office base," and that Just Energy had "never terminated any other worker with [plaintiff's] performance absent a showing of [a] fraudulent business transaction" (*id.* at 1).

After the Third Amended Complaint was served upon it, Defendant filed a pre-motion conference request, seeking permission to move to dismiss the pleading for failure to exhaust administrative remedies. By letter dated January 11, 2011, plaintiff alerted this Court that Defendant had made the same motion in a case brought by Ingram – *Ingram v. MacDonald*, E.D.N.Y. Docket No. 10-CV-3859 – which was then before Judge Weinstein. Plaintiff noted that Judge Weinstein, who had denied the motion with leave to renew it as a motion for summary judgment, had stayed discovery while Ingram exhausted her remedies before the EEOC. Plaintiff implicitly requested that a similar order issue in this case.

In light of Judge Weinstein's ruling in *Ingram*, this Court held this action in abeyance to permit plaintiff time to exhaust his administrative remedies. *See* Minute Entry for Jan. 28, 2011.

On or about February 8, 2011, plaintiff filed a charge of discrimination with the EEOC, alleging race and national origin discrimination in violation of Title VII (Tingey Declaration, Ex. 16). On March 1, 2011, the EEOC issued a right-to-sue notice, noting that it was unlikely to complete its administrative processing of the charge within 180 days of its filing (*id.*, Ex. 17).

On April 7, 2011, Magistrate Judge Lois Bloom conducted an initial pre-motion conference. Thereafter, she entered a scheduling order which provided, *inter alia*, that "[a]ny request to amend the complaint, including any request to join other parties, shall be made by May 9, 2011" (Order dated Apr. 7, 2011, at 1). On May 2, 2011, plaintiff requested leave to file a Fourth Amended Complaint (*see* Plaintiff's submission entitled, "Leave to Amend Complaint," dated May 2, 2011). Defendant did not object to that request, and plaintiff's motion was granted (Order dated May 20, 2011).

Plaintiff's Fourth Amended Complaint, however, consisted solely of seven paragraphs of factual allegations and five "Questions Presented." The factual allegations provided details regarding incidents that occurred during plaintiff's employment. For example, the first three paragraphs alleged that the head office was "not happy" about plaintiff's transfer to the Wall Street Office, that Mamune expressly told plaintiff and Ingram that they only had to come into the office on Mondays "because they both know how to work," and that Zamany subsequently required that plaintiff and Ingram come into work every day. Fourth Amended Complaint at ¶¶1-3. The sixth paragraph described in detail the incident which had resulted in plaintiff's January 2007 suspension, while the seventh paragraph recounted the positive comments which Langford had made about plaintiff at the 2007 meeting in which he described plaintiff as "the man with the million dollar smile."

Only the fourth and fifth paragraphs contained allegations specifically relating to the discriminatory acts alleged in the Third Amended Complaint. The fourth paragraph described at length what transpired when plaintiff and Ingram picked up their itineraries for the Australian trip on February 27, 2009. The fifth paragraph alleged that Morgan initially said that Langford was "within his rights not to admit plaintiff into his office," then called with Siddiqui on July 22, 2010, to advise plaintiff that he could not work on his own, and that he was being terminated "due to the closing of the Wall Street office" (Fourth Amended Complaint at ¶5). That paragraph further alleged that two other sales representatives – Jerome Jackson and David Villaman – had been permitted to work on their own, despite being less "qualified" than plaintiff (*id.*).

Three of the five "Questions Presented" related to alleged acts of discrimination. The first – "Whether or not in light of the fact that defendant withheld plaintiff['s] itinerary and issued it to others in a timely fashion, defendant did discriminate against plaintiff?" – tacitly alleged discrimination relating to the Australian trip (*id.* at 4). Two other questions implied discrimination in connection with plaintiff's termination, asking whether discrimination was established by (1) "the fact that defendant did admit other workers from the Wall Street Office and without rationale it denied plaintiff" and (2) "the fact that defendant had allowed workers who were not of a high standard as plaintiff to work on their own and denied plaintiff the same" (*id.*). The remaining two questions anticipated possible defenses, asking "Whether . . . plaintiff was an employee within the meaning of the law?" and "Whether . . . defendant correctly claims breach of contract?" (*id.*).

***Defendant's Motion for Summary Judgment***

Defendant now moves for summary judgment. Characterizing plaintiff's pleadings as alleging discrimination "on the basis of race . . . and national origin," Defendant first argues that plaintiff has failed to make out a *prima facie* case of discrimination. Specifically, Defendant argues that plaintiff cannot establish that his termination and/or any adverse employment actions that occurred in connection with the Australian trip occurred under circumstances giving rise to an inference of discrimination.

Second, Defendant argues that, even if plaintiff has made out a *prima facie* case of discrimination, he cannot establish that Defendant's reasons for terminating its relationship with plaintiff were pretexts for discrimination. Defendant implies that Langford refused to welcome plaintiff back to the Kew Gardens Office because of "Langford's experiences with Plaintiff during his prior two tenures" there (*see* Memorandum in Support of Defendant Just Energy's Motion for Summary Judgment ["Defendant's Memo"] at 15). Defendant further argues that plaintiff was not permitted to continue marketing on his own because of his "marketing history" (*id.* at 16). Defendant notes that plaintiff's pleadings do not allege that any of Defendant's employees ever made comments regarding plaintiff's race or national origin, and that plaintiff himself concedes that other black and/or Jamaican sales representatives were allowed to join the Kew Gardens Office and to market on their own.

In response to Defendant's motion, plaintiff submitted Plaintiff's Cross Motion, the last three pages of which consist of an "Affirmation" signed by plaintiff. Plaintiff's Cross Motion, despite its title, does not request summary judgment in favor of plaintiff, but requests only that Defendant's motion for summary judgment be denied. Moreover, although the submission

22

contains a lengthy discussion of the facts, both the "Cross Motion" and the "Affirmation" are unsworn.

In late March 2012 – more than one month after the motion for summary judgment was fully briefed and filed with the Court – plaintiff filed four additional submissions: a document entitled "Plaintiff['s] supplemental motion to cross motion in opposition of defendant's motion for summary judgment," a "supplemental counter statement" to defendant's statement of undisputed material facts pursuant to Local Civil Rule 56.1, and sworn affidavits from Duane Matthews and Shanda Walker. In a letter dated March 30, 2012, Defendant characterized these submissions as "improper surreply papers" and requested that this Court strike them *sua sponte*. In the alternative, Defendant requested permission to move to strike or the opportunity to respond to the papers.

In a Memorandum and Order dated April 11, 2012, this Court found that these documents constituted unauthorized supplemental submissions. However, in light of plaintiff's *pro se* status, the Court decided to consider the two affidavits and the "supplemental counter statement" – i.e., Pl. Supp. 56.1 – which more nearly satisfied the requirements of Local Civil Rule 56.1 than did the original counterstatement. The Court granted Defendant leave to submit proof in response to anything contained in the affidavits or to respond to the "supplemental counter statement" (Memorandum and Order dated Apr. 11, 2012, at 2). Although Defendant subsequently filed a three-page submission entitled, "Defendant Just Energy's Response to Plaintiffs' Surreplies," that document only reiterated positions stated in earlier submissions.

23

## DISCUSSION

### I. The Summary Judgment Standard

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may [, *inter alia*] . . . consider the fact undisputed for purposes of the motion [or] . . . grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

"[A] court reviewing a motion for summary judgment must view the evidence in the light most favorable to plaintiff and draw all reasonable inferences in [his] favor." *DiStiso v. Cook*, -- F.3d --, No. 10–4304–cv, 2012 WL 3570755, at (2d Cir. Aug. 21, 2012) (citing *Amore v. Novarro*, 624 F.3d 522, 529 (2d Cir. 2010)). However, a court "cannot credit a plaintiff's merely speculative or conclusory assertions." *Id.* (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008)). Moreover, "where a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set

out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *Id.* (quoting Fed. R. Civ. P. 56(c)(4)).

*Pro se* submissions are held to less stringent standards than submissions drafted by lawyers. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."). Thus, a court must "read the pleadings of a *pro se* plaintiff liberally and interpret them 'to raise the strongest arguments that they suggest.'" *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). In addition, trial courts must be "especially cautious in deciding whether to grant . . . [summary judgment] in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination." *Belfi v. Prendergast*, 191 F.3d 129, 135 (2d Cir. 1999). However, "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). Thus, in discrimination cases, as in all other civil cases, a plaintiff has the burden of presenting "concrete particulars" to substantiate his claims. *Id.*

### The McDonnell Douglas Framework

Reading plaintiff's pleadings liberally, plaintiff is alleging employment discrimination under the Title VII, the ADEA, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.* Title VII discrimination claims are analyzed under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012). This same framework also applies to claims of age discrimination under the ADEA, *see Bucalo v. Shelter Island Union Free School*

25

*Dist.*, -- F.3d --, 2012 WL 3240382, at \*7 (2d Cir. Aug. 10, 2012), and to discrimination claims

under the NYSHRL. *See Spiegel v. Schulmann*, 604 F.3d 72, 80 (2d Cir. 2010) (citing *Dawson v.*

*Bumble & Bumble*, 398 F.3d 211, 216-17 (2d Cir. 2005)). Under the *McDonnell Douglas*

burden-shifting framework:

> [P]laintiff bears the initial burden of proving by a preponderance of
> the evidence a prima facie case of discrimination. The burden of
> production then shifts to defendants, who must offer through the
> introduction of admissible evidence a non-discriminatory reason
> for their actions that, if believed by the trier of fact, would support
> a finding that unlawful discrimination was not a cause of the
> disputed employment action. Plaintiff then must show that the
> proffered reason was merely a pretext for discrimination, which
> may be demonstrated either by the presentation of additional
> evidence showing that the employer's proffered explanation is
> unworthy of credence, or by reliance on the evidence comprising
> the prima facie case, without more.

*Heyman v. Queens Village Committee for Mental Health for Jamaica Community Adolescent*

*Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999) (internal quotations and citations omitted).

Under Title VII, the ADEA and the NYSHRL, a plaintiff establishes a *prima facie* case of

intentional discrimination by showing that "(1) he is a member of a protected class; (2) he was

qualified for the position he held; (3) he suffered an adverse employment action; and (4) the

adverse action took place under circumstances giving rise to [an] inference of discrimination."

*Reynolds v. Barrett*, 685 F.3d 193, 202 (2d Cir. 2012) (Title VII); *see Gorzynski v. JetBlue*

*Airways Corp.*, 596 F.3d 93, 107, 110 (2d Cir. 2010) (ADEA); *Spiegel*, 604 F.3d at 80

(NYSHRL). Although the evidence necessary to establish plaintiff's initial burden has been

characterized by the Second Circuit as "minimal" and "de minimis," *see Zimmermann v.*

*Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) (citing cases), it "is not non-

existent." *Almond v. Westchester County Dept. of Corrections*, 425 F. Supp. 2d 394, 399

(S.D.N.Y. 2006). "[S]ummary judgment must be granted whenever the undisputed facts, viewed

most favorably to the non-moving plaintiff, do not make out a *prima facie* case." *Id.* In addition,

summary judgment is appropriate where the only evidence offered to prove the *prima facie* case

is conclusory and insufficiently particular to permit a defendant to respond, since "[t]o allow a

party to defeat a motion for summary judgment by offering purely conclusory allegations of

discrimination, absent any concrete particulars, would necessitate a trial in all . . . cases." *Meiri*,

759 F.2d at 998.

In this case, Defendant concedes that plaintiff can establish the first three elements of his

*prima facie* case, and argues only that the "[p]laintiff has brought forth no admissible evidence

demonstrating that any adverse employment action occurred under circumstances that give rise to

an inference of discrimination." Defendant's Memo at 10. Defendant's Memo principally

addresses the circumstances surrounding plaintiff's termination, noting, *inter alia*, that plaintiff

admitted (1) that the sales representatives at the Kew Gardens Office were a "diverse group," (2)

that other black sales representatives were permitted to transfer from the Wall Street Office to the

Kew Gardens Office, (3) that another Jamaican, Jerome Jackson, was permitted to market on his

own, (4) that Langford was difficult with all sales representatives, regardless of their race or

national origin, and (5) that Langford had previously promoted plaintiff and welcomed both

plaintiff and Ingram back to the office. *Id.* at 11-13. Defendant also argues that "there is no

evidence that [plaintiff] could not attend the trip [to Australia] because of his race and national

origin," *id.* at 14, and that any allegations regarding discrimination relating to the Australian trip

is time-barred.

27

Plaintiff's responsive papers do not directly address Defendant's arguments. Rather, they contain numerous, unsworn allegations of facts, some of which relate to the incentive trips and plaintiff's termination. Even assuming that Plaintiff's Cross Motion and the Affirmation appended thereto were sworn, however, none of those allegations establish that plaintiff suffered an adverse employment action under circumstances that give rise to an inference of discrimination.

### *The Sales Incentive Trips*

Preliminarily, this Court must address Defendant's claim that any discrimination claims relating to the sales incentive trips are time-barred. Defendant notes, in a footnote, that the trip to Australia took place in March 2009, but that plaintiff did not file a charge of discrimination with the EEOC until February 8, 2011. Defendant's Memo at 14, n. 4. Defendant then reasons that, since EEOC claims must be filed within 300 days of the incident giving rise to the claim, plaintiff's claims regarding the Australian trip are time-barred. *Id.* (citing *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126 (2d Cir. 2010)). Using the same rationale, Defendant argues that any claims relating to the Las Vegas trip – which occurred two year before the Australian trip – must also be time-barred.

"Exhaustion of administrative remedies through the EEOC is an essential element of the Title VII and ADEA statutory schemes and, as such, a precondition to bringing such claims in federal court." *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001) (per curiam) (internal quotation marks omitted). The time period for filing the charge of discrimination varies, depending on whether the individual files his charge directly with EEOC or with a state or local agency. In New York, which has both state and local fair employment

agencies, an individual who initially files a grievance with the state or local agency must file a

charge with the EEOC within 300 days "after the alleged unlawful employment practice

occurred," or within 30 days after receiving notice that the state or local agency has terminated

the proceeding, whichever is earlier. 42 U.S.C. § 2000e-5(e)(1). If a charge is filed solely with

the EEOC, it must be filed within 180 days after the alleged unlawful employment practice

occurred. *Id.* However, these time limits are not jurisdictional and are, therefore, "subject to

waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393

(1982). Equitable tolling may be appropriate, for example, "where the plaintiff actively pursued

judicial remedies but filed a defective pleading during the specified time period." *Brown v.

Parkchester S. Condos.*, 287 F.3d 58, 60 (2d Cir. 2002)

In this case, it is not clear whether plaintiff failed to pursue his administrative remedies

within the 300-day deadline. In his Third Amended Complaint, filed in November 2010, plaintiff

alleged that he attempted to file a charge with the EEOC but was told that the EEOC lacked

jurisdiction because he was an "independent contractor." Third Amended Complaint at 2. This

pleading did not allege precisely when plaintiff contacted the EEOC, or what adverse

employment actions were the subject of his proposed charge of discrimination. Nonetheless,

since it is clear that plaintiff actively pursued his administrative remedies – albeit ineffectively –

it is impossible to discount entirely the possibility that equitable tolling might be appropriate in

this case.

To be sure, plaintiff has not mentioned equitable tolling or clarified when, if ever, he filed

a charge of discrimination relating to the trips. Because Defendant's argument on this point was

contained in a footnote, however, this Court cannot determine whether plaintiff's failure to do so

29

is due to the fact that plaintiff lacks meritorious arguments or due to the fact that he overlooked this point altogether. Accordingly, this Court declines to dismiss plaintiff's discrimination claims arising from the trips as time-barred and will reach the question of whether Defendant's actions relating to the trips took place under circumstances giving rise to an inference of discrimination.

### The Trip to Las Vegas

Defendant's Memo does not construe plaintiff's Fourth Amended Complaint as alleging an employment discrimination claim in connection with the trip to Las Vegas. The Third Amended Complaint discussed this trip at length, stating that Langford first announced that employees could receive cash in lieu of the trip, then reneged on that offer when plaintiff and another Jamaican sales representative attempted to cash in, saying that "there was no money as the company did not sell the itinerar[ies]." Third Amended Complaint at 3. However, the Fourth Amended Complaint omitted any mention of the Las Vegas trip, addressing only the trip to Australia. Since amended complaints supercede, rather than supplement, a party's prior pleadings, Defendant apparently interpreted the Fourth Amended Complaint as dropping all claims arising from the Las Vegas trip.

Defendant's interpretation is entirely reasonable. However, even if the Fourth Amended Complaint were interpreted as a supplemental pleading, the Third Amended Complaint would not suggest a valid employment discrimination claim relating to the Las Vegas trip. That pleading may suggest that Langford breached an oral agreement to compensate sales representatives who elected not to go on the trip, but it does not allege that Langford treated any other sales representatives differently than the Jamaicans.

30

Moreover, to the extent that plaintiff's pleadings could be read as alleging an employment discrimination claim relating to the Las Vegas trip, plaintiff has not adduced any facts to suggest that Langford's actions were discriminatory. Plaintiff's Cross Motion implies that Langford misled plaintiff to believe that he could receive the cash value of the trip by filling out an application. Plaintiff's Cross Motion at 2. After plaintiff submitted the application, Langford gave plaintiff's trip to another, unqualified sales representative and told plaintiff that he could not reimburse him for its value because he had been unable to sell the trip to another sales representative. *Id.*

While plaintiff alleges that another Jamaican, Douglas Pryce, was also deceived, plaintiff has not adduced any evidence suggesting that Langford's actions had anything to do with plaintiff's race, national origin, or age. Plaintiff asserted at his deposition that "[e]verybody gets paid for the trips," and named Clayton Chance and Robert Martindale as examples of sales representatives who were allegedly paid. Pl. EBT at 23. However, Chance was himself half black and Jamaican-born. *Id.* at 125-26. In addition, plaintiff was "not sure" whether Just Energy had been able to find buyers for Chance's and Martindale's trips. *Id.* at 23.

Plaintiff's Cross Motion seeks to cast doubt on Langford's claim that the payout was dependent on defendant's finding a buyer for the trip, asserting that, during plaintiff's tenure at Just Energy, "it was a claim [*sic*] that once you work for the defendant and you were not qualified on your own you could not go on the trip." *Id.* at 2-3. However, even if plaintiff could prove this assertion, it would not suffice to counter Defendant's evidence regarding its cash payout policy. According to the sworn affidavit of Richard Teixeira, Just Energy's Director of Sales Operation, Defendant provides a cash payout only to those sales representatives who

31

cannot attend a sales incentive trip due to medical or legal reasons. Teixeira Aff. at 9. Sales representatives without a valid medical or legal reason can request cash in lieu of a trip, but that request is honored only if Defendant succeeds in finding a sales representative willing to purchase the trip. *Id.* at ¶10. Plaintiff offers no evidence to suggest that Defendant did not attempt to find a buyer for the trip, much less any evidence that Defendant did so on account of plaintiff's race, nationality, or age.

### *The Australian trip*

Similarly, plaintiff has offered no admissible evidence that plaintiff suffered an adverse employment action in connection with the Australian trip, or that such adverse action took place under circumstances giving rise to an inference of discrimination. It is beyond dispute that plaintiff was made aware that he qualified for the trip to Australia sometime prior to January 14, 2009, when he electronically registered for the trip. Pl. EBT at 26, 41; Tingey Declaration, Ex. 14. Plaintiff, who had qualified for, and attended, a sales incentive trip to Brazil in 2007 (Pl. EBT at 18-19), was aware that he, as the holder of a Jamaican passport, would need to go to the consulate and obtain a visa for the trip. Pl. EBT at 43. Yet, plaintiff did not visit the consulate until two days prior to the trip, by which time it was too late to secure a visa. Pl. EBT at 45-47.

Plaintiff blames Langford, asserting that he deliberately withheld plaintiff's itinerary until February 25, 2009, to prevent plaintiff from going to the Australian consulate in time to obtain a visa. However, plaintiff has offered no evidence that he needed a written itinerary in order to apply for a visa. Rather, plaintiff testified that he believed that he needed to present his itinerary because the person who gave him his Brazilian itinerary in 2007 told plaintiff to bring it with him to the *Brazilian* consulate (Pl. EBT at 39).

32

Even assuming that Australia required an itinerary as part of its visa application, plaintiff has produced no admissible evidence that Langford knew of that requirement and deliberately withheld the itinerary. Plaintiff admitted at his deposition that he had no personal knowledge of when Langford received his itinerary, *id.* at 32, or when he distributed the itineraries to other sales representatives. *Id.* at 38. Rather, plaintiff testified that a front desk clerk named, "Liz," told him and Ingram, "[n]ot to say that she told us but Chad gave everyone else their itinerary a long time ago and they already went for their visa." *Id.* However, Liz's statements, if offered to prove when Langford distributed the itineraries, are inadmissible hearsay.

Even if Liz's statements were admissible, they would not establish that Langford deliberately withheld the visa to prevent plaintiff from attending the trip. To the contrary, plaintiff alleged in his Fourth Amended Complaint that Langford telephoned plaintiff regarding his itinerary on February 25, 2009, Fourth Amended Complaint at ¶4, even though plaintiff himself had not asked anyone at Just Energy for his itinerary prior to that. Pl. EBT at 39. At the time of Langford's call, plaintiff was apparently unaware that it took 15 days to obtain an Australian visa, for he and Ingram waited another two days before coming into the office to obtain the itinerary. *Id.* Plaintiff simply assumes that Langford had superior knowledge regarding these requirements. However, there is no evidence to this effect – no evidence that Langford knew how long it would take for plaintiff to obtain a visa and no evidence that Langford believed that the itinerary was necessary for plaintiff, a Jamaican, to obtain a visa. Furthermore, plaintiff assumes that Langford – not plaintiff himself – was responsible for ensuring that plaintiff made the trip, complaining that "Chad should have ensured that plaintiff got his itinerary earlier." Plaintiff's Cross Motion at 15. However, the registration website –

which plaintiff never logged onto himself – expressly reminded sales representatives who did not hold Canadian or American passports to "contact the Fiji and Australian Consulate near you to find out what you require for travel." Taylor Aff. at ¶7.

Finally, even assuming that Langford deliberately prevented plaintiff from taking the trip, there is no evidence suggesting that he acted based on discriminatory motives. Although plaintiff alleges that he and Ingram – both of whom are Jamaican – were the only two sales representatives to receive their itineraries so late, plaintiff admitted at his deposition that he did not know when Langford distributed the itineraries to other sales representatives. Pl. EBT at 38. The only evidence to substantiate this allegation is Liz's hearsay statement that "Chad gave everyone else their itinerary a long time ago." *Id.* Moreover, because plaintiff and Ingram worked as a team, the coincidence that they were the last two to receive itineraries would not, standing alone, imply race or national origin discrimination. Accordingly, plaintiff has not established that any adverse employment action he may have suffered in connection with the Australian trip took place under circumstances giving rise to an inference of discrimination.

### *Plaintiff's Termination*

In analyzing whether plaintiff has adduced sufficient evidence to establish that his termination took place under circumstances giving rise to an inference of discrimination, this Court notes that two distinct acts led to plaintiff's termination. First, Langford refused to allow plaintiff to transfer back to the Kew Gardens Office. Second, Siddiqui determined that plaintiff should not be permitted to market on his own.

### *Langford's Actions*

With respect to the refusal to permit plaintiff to transfer to Kew Gardens, this Court notes that Langford's actions occurred after plaintiff voluntarily left the Kew Gardens Office on two

34

prior occasions. Although it is unclear whether Langford hired plaintiff in November 2006, it is

undisputed that plaintiff worked for Langford for over a year before electing to leave the Kew

Gardens Office in March 2008. During that time, either at Langford's direction or with

Langford's acquiescence, plaintiff was promoted to the position of Assistant Crew Coordinator.

Although he was subsequently stripped of that position, plaintiff offers no evidence that his

removal was related to race or national origin. To the contrary, he noted at his deposition that his

demotion occurred after the Crew Coordinator, Duane Matthews, was removed from his position

after being arrested on allegations of domestic violence.

After plaintiff left the Kew Gardens Office the first time, Langford made extraordinary

efforts to lure plaintiff and Ingram back to his office. By plaintiff's own account, Langford "got

happy" when those efforts succeeded and plaintiff and Ingram agreed to return in mid-2008 (Pl.

Supp. 56.1 at ¶8). Although Langford subsequently terminated Ingram, plaintiff continued to

work in the Kew Gardens office until April 2009, when plaintiff elected to leave for the Wall

Street Office.

It was only when plaintiff sought to return to the Kew Gardens Office for a third stint in

July 2010 that Langford refused to admit him. As the Second Circuit has observed in other

contexts, "where the person who made the decision to fire was the same person who made the

decision to hire, it is difficult to impute to [him] an invidious motivation that would be

inconsistent with the decision to hire." *Schnabel v. Abramson*, 232 F.3d 83, 91 (2d Cir. 2000)

(quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).[4] Although this so-

---

[4]While the Second Circuit may not, in any reported opinion, have "pass[ed] judgment on
the extent to which this [same actor] inference is either required or appropriate outside the
[ADEA] . . . context in which it generally is applied," *Feingold v. New York*, 366 F.3d 138, 155
n. 15 (2d Cir. 2004), this Court notes that the Second Circuit has used this inference in
unreported Title VII cases. *See, e.g.*, *Filozof v. Monroe Cmty. Coll.*, 411 Fed. Appx. 423, 427

called "same actor inference" may not be entirely on point, the facts that Langford promoted plaintiff, was once eager to re-hire him, and never fired him – all despite his race and national origin – strongly suggest that invidious discrimination is unlikely to be the cause of Langford's actions. *See Grady*, 130 F.3d at 560.

Plaintiff has not introduced any evidence that Langford's actions were motivated, even in part, by race or national origin discrimination. Plaintiff testified at his deposition that other sales representatives from the Wall Street Office were admitted to the Kew Gardens Office, while plaintiff and Ingram were not. Pl. EBT at 100-01. However, that testimony was based solely on plaintiff's own observations during his July 13, 2010, visit to the Kew Gardens Office, where he saw approximately seven sales representatives who had formerly been employed at the Wall Street Office. *Id.* at 143-44. While plaintiff claims that none of the admitted representatives were Jamaican, he testified that at least three were black. *Id.* at 101-03, 123.

Plaintiff presents no evidence regarding how many sales representatives sought to transfer from the Wall Street Office, how many were accepted into the Kew Gardens Office, and what the nationalities of those representatives were. However, even assuming that plaintiff and Ingram were the only two sales representatives rejected by Langford, this fact alone would not permit an inference of national origin discrimination. While plaintiff and Ingram are both Jamaican, they worked together closely as a team. In addition, they both reported to the Wall Street Office on July 13, 2010 – five days after the Wall Street Office closed – by which time other former Wall Street employees were already working at the Kew Gardens Office. Moreover, plaintiff testified that his co-workers at the Kew Gardens Office were of diverse national origins and included

(2d. Cir. 2011) (summary order); *Mastrolillo v. Connecticut*, 352 Fed. Appx. 472, 474 (2d Cir. 2009) (summary order).

Hispanics, Trinidadians, Indians, an African, and other Jamaicans (*Id.* at 129-40). In light of all of these circumstances, one cannot infer solely from Langford's refusal to permit plaintiff and Ingram to join his staff that his actions had anything to do with their national origin.

Plaintiff also fails to present any evidence whatsoever regarding age discrimination. At his deposition, plaintiff named several sales representatives who were permitted to transfer from the Wall Street Office, but did not know their ages. *Id.* at 101-03. Plaintiff also was unable to give the ages of most of the sales representatives with whom he had worked at the Kew Gardens Office. Indeed, one of the few sales representatives whose age was known to plaintiff was Douglas Pryce, a man in his fifties. *Id.* at 137-38.[5] Accordingly, there is no evidence to support an inference of age discrimination.

### *Siddiqui's Actions*

There is also no evidence from which one could infer that Siddiqui's decision not to permit plaintiff and Ingram to market on their own was a product of race, national origin, or age discrimination. Indeed, plaintiff's own statements establish the contrary. First, plaintiff admitted at his deposition that another Jamaican black man, Jerome Jackson, *was* permitted to work independently. Pl. EBT at 121-22. Although plaintiff asserts that Jackson was not as qualified as he, plaintiff makes no effort to reconcile this fact with his allegations of discrimination.

Second, plaintiff himself concedes that his age was not a but-for cause of plaintiff's termination.[6] Indeed, plaintiff himself suggested two non-discriminatory motivations. In

---

[5]Although plaintiff's deposition spells this man's last names "Price," plaintiff's submissions refer to this man as "Douglas Pryce."

[6]Title VII expressly authorizes a "mixed motive" discrimination claim, allowing for employer liability when discrimination "was *a motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). Since the ADEA contains no such provision, the Supreme Court has ruled that a plaintiff

Plaintiff's Motion, filed September 14, 2010, plaintiff stated that his failure to reach the "minimum production [requirement] of twenty five R.C.E. per week" may have "formed a part of the decision" to terminate him. Plaintiff's Motion at 2. In addition, in that same document and during his deposition, plaintiff opined "that part of the decision to terminate [him] was based on [his] refusal to help Ali Zamany train new independent contractors." Pl. EBT at 103, *see* Plaintiff's Motion at 2. Accordingly, by plaintiff's own reckoning, his age was just one of several reasons behind his termination.

### *Defendant's Non-Discriminatory Rationale for Termination*

Even assuming that plaintiff could make out a *prima facie* case of discrimination in connection with his termination, the evidence would not establish that Defendant's non-discriminatory reasons for Langford's and Siddiqui's actions were merely a pretext for discrimination. The uncontroverted evidence establishes that, for two years after his suspension in January 2007, plaintiff was the subject of relatively few customer complaints or allegations. In 2007 and 2008, plaintiff had only three allegations against him each year. *See* Tingey Declaration, Ex. 8. In addition, he was productive, as evidenced by the fact that he qualified for at least three sales incentive trips between 2007 and January 2009. Indeed, plaintiff claims – and Defendant does not deny – that he was integral in helping Langford to win the "Office of the Year" award for 2008.

Beginning in late May 2009, however, the number of allegations made by customers against plaintiff increased. According to the IC Summary, there were four complaints against plaintiff between May 28 and October 16, 2009, and two more allegations against him during the

---

suing under the ADEA must demonstrate that age was not just a motivating factor behind the adverse action, but rather the "but-for" cause of it. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176-77 (2009).

38

first two weeks of March 2010. *See* Tingey Dec., Ex. 8. All of these allegations were made sometime after the New York Attorney General had expressed concerns about the conduct of some of Defendant's sales representatives, and after Defendant had entered into an "Assurance of Discontinuance" or "AOD" with the Attorney General.

The two, closely spaced allegations against plaintiff in March 2010 triggered internal regulatory scrutiny, as reflected in e-mails in mid-March 2010. *See* Tingey Declaration, Exs. 10 & 11. Faced with responsibility for plaintiff's actions, Ali Zamany, who was plaintiff's regional distributor at the time, blamed plaintiff, asserting that he did not show up for meetings and was "affecting office demeanor." Tingey Declaration, Ex. 11. Zamany was apparently able to convince Siddiqui that plaintiff was at fault, for she and Zamany both requested that plaintiff be given a "final warning." *Id.* The Corporate & Customer Relations Department declined to do so, but Zamany exacted a promise that plaintiff would attending the morning meeting five days a week.

Plaintiff amassed at least three more allegations before July 8, 2010, when the Wall Street Office closed amid charges of wide-spread fraud. When plaintiff arrived at the Kew Gardens on July 13, 2010 – after being alerted to the Wall Street Office's closing by a call from a co-worker – it would have been readily apparent to all concerned that plaintiff had not been visiting the Wall Street Office regularly. Indeed, while Langford does not explicitly state in his affidavit why he refused to admit plaintiff and Ingram to his office, Langford does state that plaintiff and Ingram had not regularly attended meetings when they worked in Kew Gardens and had customer complaints leveled against them. Langford Aff. at ¶¶9-10. In light of the increased regulatory scrutiny and the regional distributor's responsibility for ensuring compliance, it is obvious why Langford was not interested in having plaintiff and Ingram return.

Siddiqui had already been convinced by Zamany that plaintiff was a liability. She made that view clear to Morgan, expressing the view that plaintiff and Ingram "would potentially pose a risk to our business without the leadership and guidance of a Regional [Distributor] and the benefits of visiting a Regional office on a regular basis." Tingey Declaration at Ex. 12. Accordingly, Siddiqui denied plaintiff permission to market on his own and terminated him.

In his responsive papers, plaintiff offers no evidence to show that this non-discriminatory explanation for plaintiff termination was pretextual. Indeed, while he devotes large portions of Plaintiff's Cross Motion to explaining why the customer allegations were without merit, plaintiff does not deny that these allegations were made. Similarly, plaintiff opines that he was "more qualified" than Jackson – another Jamaican, black man who was authorized to work independently – because Jackson "always wanted to come with [plaintiff] so [plaintiff] could teach him how to close deals." Pl. EBT at 122. However, even if this evidence suffices to establish that plaintiff was more productive than Jackson, plaintiff offers no evidence concerning the number of customer complaints against Jackson.

Plaintiff does not offer any evidence to suggest that Langford or Siddiqui were motivated by discriminatory animus. Plaintiff admits that he has no direct evidence of such animus, stating, "Plaintiff will not boldface lie and say he was told by anyone at defendants [sic] business that they don't like blacks or Jamaicans." Plaintiff's Cross Motion at 3. Rather, plaintiff relies solely on "circumstantial evidence." Id. However, as explained at length above, the circumstantial evidence suggests that plaintiff's termination was based solely on business considerations, not discrimination. Accordingly, plaintiff has not shown that Defendant's non-discriminatory reasons for plaintiff's termination were merely a pretext for discrimination.

## CONCLUSION

For the reasons set forth above, defendant Just Energy's motion for summary judgment is granted. Since plaintiff has withdrawn his claims against all other defendants, the Clerk of Court is directed to enter judgment in accordance with this Memorandum and Order and to close this case.

**SO ORDERED.**

/ SANDRA L. TOWNES
United States District Judge

Dated: September 17, 2012
Brooklyn, New York